BELKNAP.

---

MORRISON *v.* THE CITIZENS NATIONAL BANK *& a.*

A surety is not discharged by the creditor's neglect to levy his execution, obtained in an action against the principal, upon the principal's property therein attached.

A creditor who brings an action against the debtor to recover a claim for which another is surety, and causes his property to be attached, and also an action on an unsecured claim in which the same property is attached subject to the other attachment, and obtains judgment on both suits, may without prejudice to his rights against the surety apply the attached property to the satisfaction of the judgment on the unsecured demand.

BILL IN EQUITY, alleging that April 12, 1881, the defendant bank being the holder of an overdue promissory note signed by one Dearborn, payable to the order of the plaintiff and by him endorsed, waiving demand and notice, and which had been discounted by it for the plaintiff, brought suit against the plaintiff upon his liability as endorser, and October 5, 1881, obtained judgment for $250.11 damages, and costs, $4.57, and October 29, 1881, took out execution therefor against the plaintiff, which sums the plaintiff paid to the bank March 25, 1882; that on the same April 12, the bank brought a suit against Dearborn in which the same note was included. October 5, 1881, the bank obtained

judgment in the suit against Dearborn, and in making up the judgment the sum of $250.11 was included on account of his liability on the note.    That the sheriff, Lang, the other defendant, returned upon the writ in the latter suit the attachment and sale of certain personal property, sufficient to satisfy the entire execution, if levied thereon; that this execution has endorsed upon it as paid, March 25, 1882, $250.11 and interest from date of judgment, but was not levied on any portion of the proceeds of the personal property sold; that the whole of said proceeds was applied by Lang upon other executions in his hands in favor of the bank against Dearborn, which were obtained in suits also brought April 12, 1881, wherein judgment was rendered October 5, 1881, and execution issued October 29, 1881.    The personal property is returned as attached on the writs in these suits subject to the attachment in the suits against Dearborn; that the payment by the plaintiff to the bank was made without knowledge on his part of the suits of the bank against Dearborn or the attachment of Dearborn's property; and as soon as the plaintiff learned the facts alleged in the bill, he caused this action to be brought.

The prayer of the bill is, (1) that the bank be ordered to return said $250.11, with interest, cost, and charges, to Lang, that the execution in the first mentioned suit against Dearborn be decreed to be still in force for the benefit of the plaintiff, and that Lang be ordered to levy that execution on the $250.11 for the benefit of the plaintiff; or (2) that this bank be ordered to return that sum to Lang, and allow the plaintiff to enforce the judgment in that suit for his own benefit against the money; or (3) that the bank be ordered to return the money to the plaintiff, with interest, and for such other relief as may be just.

The defendants demur to the bill, claiming the legal right in the bank to sue both the plaintiff and Dearborn on the note and collect of either, and the right to abandon the attachment made in the suit against Dearborn, and insist upon payment from the plaintiff.

The defendants also filed an answer, the bank admitting the foregoing allegations, except upon the following points wherein it is agreed,—(1) That the sum actually paid the bank by the plaintiff for a release of its claim against him was $253, which was accepted in full of said judgment.    (2) The endorsement of $250.11 upon the execution against Dearborn, with interest, from October 5, 1881, was made by the attorney of the bank upon learning of the payment by the plaintiff, and was made for the purpose of striking from the judgment the amount claimed against Dearborn on the note on which the plaintiff was sued as endorser.    No money was paid to the bank on account of the note indorsed by the plaintiff except what was paid by the plaintiff.    (3) The plaintiff knew at the time of his payment that Dearborn had been sued and all his property attached and levied upon, but did not know that the liability of Dearborn upon this note was included in any suit

against Dearborn, except so far as he is chargeable with notice and knowledge from the record in said suit.    The plaintiff, at the time he heard of the failure of Dearborn, in April, 1881, and down to the time the writ was served on him, September 12, 1881, supposed Dearborn had paid the note indorsed by him.

For further answer, the bank alleges that on said April 12, 1881, it and the Iona Savings Bank held a large amount of Dearborn's paper, the total unsecured amount of which they found to be greater than the value of Dearborn's unincumbered property; that the two banks agreed together that each bank should collect for its separate use, from the securities, personal or otherwise, held by each, the largest amount practicable ; that suits should be brought, and all sums that could be realized by levy upon Dearborn's unincumbered property should be divided between them in proportion to the remaining indebtedness of Dearborn to each bank after the application of the amounts collected by each from any security held by it.    A large number of suits were accordingly brought by each bank all on the same day, the writs were all delivered to the officer Lang at the same time without instructions as to the priority of any, and the attachment of the personal property made at the same time on all the writs ; that the proceeds of the sale were divided between the banks, and the sum paid by the plaintiff to the defendant bank retained by it in accordance with said agreement; that the banks still hold executions against Dearborn obtained in said suits which his property was insufficient to satisfy, to the amount of $2,590 ; that if the returns of attachment and levy made by the defendant Lang are not such as properly to carry out the agreement between it and said savings-bank, the defendant bank asks that the defendant Lang be ordered to come in and amend his returns so as to correspond with said agreement and give effect thereto.

The plaintiff denies that the alleged agreement between the banks, or the purpose of the attorney in making the endorsement upon the execution, is material, and objects to any amendment of the sheriff's return.    The plaintiff denies that the writs were delivered to the officer without instructions as to priority.    The defendants reserve the right to prove this, if, in the opinion of the court, it is material.

The allegations of the bill and answer above set forth are to be taken as facts except where it is otherwise herein specifically agreed, and the court may make such order as the same require.

*F. N. Parsons* (with whom were *Chase & Streeter* and *C. C. Rogers*), for the defendants.    Either the judgment against the plaintiff was a legal claim when he paid, or it was not.    If it was, he has no ground for complaint.    If it was not, then the plaintiff merely seeks to recover money wrongfully paid.    This is not ground for relief in equity.    The facts relied on by the plaintiff

are, that the bank, being the holder of an overdue promissory note discounted in the ordinary course of business for the plaintiff as indorser, on the same day brought suits both against the plaintiff and the maker of the note, and October 5, 1881, recovered judgment in each suit, and took out separate executions against the plaintiff and one Dearborn, the maker. Upon the writ in the suit against Dearborn is returned the attachment and sale of personal property sufficient to satisfy the execution, if levied thereon. No levy was made on the execution against Dearborn, and the bank took no further steps in that suit after taking out execution. The attachment being thus waived, abandoned, or lost in this suit, the proceeds of the sale were applied on executions obtained in suits in which the attachment was returned as subject thereto. This waiver, abandonment, or loss of the attachment originally re- turned upon the writ in the suit against Dearborn is the fact which the plaintiff claims operated in law as a discharge of the judgment against him ; and because he paid, March 25, 1882, said judgment without actual knowledge of said attachment and its loss or abandonment, which want of knowledge can be attributed only to his own negligence, he now asks a court of equity for relief. Both judgments having been rendered October 5, 1881, and the plaintiff having delayed his payment until March 25, 1882, all right to hold the proceeds of the property sold on the writ for application upon the execution in the suit against Dearborn by virtue of the attachment was gone, and the bank had no lien, by attachment or otherwise, to which the plaintiff might have been subrogated if he had the right, so that the only ground upon which the indorser's release can be claimed is the failure of the bank to levy on the property of the maker, or, as the plaintiff's counsel state it, the want of notice to the plaintiff of the attachment while in force.

(1) The contract of the plaintiff with the bank, upon its discount of Dearborn's note for him as indorser waiving demand and notice, was, that the plaintiff would pay to the bank the amount of the note if unpaid by Dearborn at maturity. It was a new and independent contract, the liability of the plaintiff upon which became absolute upon the non-payment of the note at maturity. It was not a collateral undertaking to that of Dearborn, and was not a contract of suretyship. *Ross* v. *Jones*, 22 Wall. 576, 588, 589; Edw. Bills 292, 293 ; Sto. Pr. Notes, *s.* 135, *n.* (5th ed.) ; *Ogden* v. *Saunders*, 12 Wheat. 213, 341 ; *Young* v. *Bryan*, 6 Wheat. 146, 152; *Aymar* v. *Sheldon*, 12 Wend. 439, 443 ; *Pitts* v. *Congdon*, 2 N. Y. 352; 2 Am. Lead. Cas. 321 ; *Trimble* v. *Thorne*, 16 Johns. 151; *Bank* v. *Ellis*, 9 Rep. 204; *Hurd* v. *Little*, 12 Mass. 502 ; *Lenox* v. *Prout*, 3 Wheat. 520, 525.

(2) But even were the plaintiff surety instead of indorser, under the decisions in this state the failure of the defendant bank to levy against Dearborn would not discharge him. *Bank* v. *Rogers*, 16 N. H. 18; *Barney* v. *Clark*, 46 N. H. 516. In *Prescott* v.

*Perkins*, 16 N. H. 305, it was claimed by the plaintiff that the attachment of the principal's property by the creditor, and its abandonment after judgment, operated as a release of the sureties. The court say,—" The plaintiff cannot treat the attachment as a satisfaction of the debt, or as a release of himself." In *Baker* v. *Davis*, 22 N. H. 27, 37, the court say,—" We are not, however, prepared to hold that a creditor cannot commence a levy on land of the principal debtor, and abandon it, without discharging the surety. The authorities would seem to lead in the other direction."

(3) But the plaintiff claims that if he had paid the judgment while the attachment was in force, he might have stipulated for an assignment of that suit, and levied upon the attached property for his own benefit, and asks the court to revive an extinct attachment, and order a levy for his benefit, regardless of the rights of any third-parties. He asks this on the ground (*a*) that he did not have actual knowledge (*b*) that it was the duty of the bank to inform him.

We claim (*a*) that even if the plaintiff had paid while the attachment was in force, he would not on the facts reported have been entitled to enforce the judgment of the bank against this property for his benefit. The bank had the right, bringing all the suits at once, as it did, to apply the property seized as it saw fit. This right was the same after judgment as at the commencement of the suits, and is not limited by the order or manner of attachment. (*b*) The plaintiff was notified, September 12, 1881, that the bank claimed payment of this note of him. At the same court at which he was sued, all the facts of which he now complains were spread on the record. He knew Dearborn was also sued, and nothing but gross carelessness and negligence could have prevented actual knowledge on his part. (*c*) There was no duty resting on the bank to inform the plaintiff of the attachment. No authorities are cited to support the plaintiff's claim, and it is directly contrary to the reasoning of the cases above cited. (*d*) The only obligation upon the holder was, to do no act to hinder or defeat the remedy of the indorser against the maker.

(4) The plaintiff errs in confounding the security of an attachment with collateral security voluntarily offered by the principal debtor, and accepted. With the authorities cited upon the duty of the creditor in the management of collateral securities accepted by him we have no contention. They are apart from this case. The creditor is under no obligation to accept securities when offered. *Bank* v. *Young*, 43 N. H. 457, 461. But if he does accept them, upon that acceptance arises the duty for the proper care of them. The distinction in all the cases is between security voluntarily offered, and that obtained by motion of the creditor as by suit and attachment. In the latter, the creditor is bound to no step further than a sense of his own interest dictates.

(5) As to the equities between the parties, the plaintiff had the money of the bank. The plaintiff contracted to return the money on non-payment of the note at maturity. If he wished to protect himself against Dearborn, he had the right at any time to pay the note, and take what steps seemed meet to him. Instead of keeping his contract, he allowed the note to remain long overdue, and forced the bank to the expense of obtaining a judgment against him, and then refused payment until five months after judgment. In the words of Mr. Justice *Livingston*, in *Lenox* v. *Prout*, 3 Wheat., cited *supra*,—"A person so regardless of his interest as well as duty . . . . who has not only refused to pay a note indorsed by him when due, but has put the holders to the trouble, delay, and expense of proceeding to judgment against him, has but little right to be dissatisfied if a court of equity shall not think itself bound by any extraordinary exertion of its powers to extricate him from a difficulty and loss which he might so easily have avoided."

There is no allegation that the bank discharged the attachment. It is the inaction—the failure to levy—which is alleged in the bill, and appears here as a fact,—simply allowing the thirty days to run out. What became of the proceeds is immaterial. Either the bank was bound to levy the proceeds on this execution, and responsible to the plaintiff for its failure to do so, or it was not. In either case, the after disposition of the proceeds cannot affect the plaintiff's rights.

The case does not call for an application of the doctrine of subrogation, or a discussion of its principles. The question is simply whether the failure to levy the execution in the suit against Dearborn operated as a discharge of the judgment against the plaintiff. The case of *Pole* v. *Ford*, 2 Chit. 125, is precisely in point that it does not.

The most that the failure of the bank to levy against Dearborn amounts to is mere indulgence or forbearance, which, it is well settled, will not discharge either surety or indorser, unless there be a binding agreement to give time to the debtor. The case of *Clark* v. *Sickler*, 64 N. Y. 231, cited by the plaintiff, in its reasoning is decisive against him. See, also, *Bank* v. *Poucher*, 56 N. Y. 348; *Strong* v. *Foster*, 17 C. B. 201; *Bank* v. *Rollins*, 13 Me. 202; *Hogshead* v. *Williams*, 55 Ind. 145; *Jerauld* v. *Trippet*, 62 Ind. 122. The latter is a case precisely in point, and cites a large number of authorities, including among others the New Hampshire cases of *Barney* v. *Clark* and *Bank* v. *Rogers*, and the following: *Sawyer* v. *Bradford*, 6 Ala. 572; *Hetherington* v. *Bank*, 14 Ala. 68; *M'Kenny's Ex'rs* v. *Waller*, 1 Leigh 476; *Alcock* v. *Hill*, 4 Leigh 673; *Newell* v. *Hamer*, 4 How. (Miss.) 684; *U. S.* v. *Simpson*, 3 Penr. & W. 437; *Mundorff* v. *Singer*, 5 Watts 172; *Pickens* v. *Finney*, 12 Sm. & M. 468; *Bank* v. *Govan*, 10 Sm. & M. 333;—see, also, *Bank* v. *Raynolds*, 13 Ohio 84, 104, which

expressly decides that the loss of lien by failure of the creditor to act does not discharge the surety.

*C. B. Hibbard* and *S. S. Jewett*, for the plaintiff.    The question presented is, whether a creditor who has a judgment against the maker of a note and good security, by attachment, may abandon that security, discharge it, and collect of an endorser who was ignorant of the existence of the security, and whose ignorance is not attributable to his own carelessness.    The case is the same as if it had been principal and surety instead of maker and endorser.

"A surety who pays the debt may stipulate for an assignment of the collateral securities held by the creditor, and the debt will be held unpaid so far as is necessary to support those securities. An attachment is deemed such a collateral security, and an assignment of the action will entitle the surety to prosecute the same, and to levy the execution recovered for his own benefit.    A parol assignment is sufficient in such a case."    *Brewer* v. *Franklin Mills*, 42 N. H. 292; *Mahurin* v. *Pearson*, 8 N. H. 539.    It would be more consonant with the general principles of the law of sureties to require a creditor who has a security which needs for its enforcement some active measures that he is not obliged to take, such as an attachment, to give the surety notice of his intention to abandon it, even when the surety has not been misled by any representations, and so lulled into a feeling of safety.    But the courts have been disposed to hold him up pretty strictly to his duty to look out for his own interests, and it may not now be an open question.    When, however, the surety does not know the facts on which his right to pay and be subrogated rests, the reasoning of the cases on this point no longer applies.    In justice and equity the law ought to require that the surety should have notice in such case from the creditor, and if he has none, that he be released. Bisp. Eq., *ss.* 338, 339; 1 Lead. Cas. Eq. (3d Am. ed.) 144. "If a creditor surrenders valid collateral security without the knowledge of the surety, the latter will be discharged entirely, or *pro tanto*, according to the value of the security thus surrendered." *Bank* v. *Colcord*, 15 N. H. 119; *Watriss* v. *Pierce*, 32 N. H. 560, 574, 577.    "And the fact that other security, as good or better than that surrendered, is substituted for it, will not preclude the surety from availing himself of the discharge."    *Id.*

The case of *Bank* v. *Rogers*, 16 N. H. 9, 16, 19, is unquestionably a sound case, both in the results reached and in the reasoning of the opinion leading to those results.    No point decided or even suggested in that case is disputed by the plaintiff in this.    But the distinction between the two is clear.    There, the surety knew of the security, and refused to bear even a part of the expense of enforcing it; here, the surety knew nothing of the security: there, the surety insisted on the creditor's fighting at his (the creditor's) expense a lawsuit against one claiming the prop-

erty as mortgagee, as well as prosecuting the action against the principal; here, the action against the principal was done with at the time the security was released, and there had been, during the several months the property had been held, no sign or intimation of any adverse claimant. The plaintiff does not assert that he could have required the bank to be at any expense, or to take any trouble to enforce the security for his benefit; he does not need to assert that the bank might not have abandoned the security without notice to him if he had had knowledge of its existence and had taken no steps to enforce it for his own benefit in the way prescribed by law, that is, by paying the debt and then claiming the right of subrogation. He asserts only that he was guilty of no carelessness in not trying to enforce a security of whose existence he was not informed, and of which he should have been informed by the defendant bank. "When a negotiable note is taken as collateral security, the creditor is bound to give notice to the endorsers." *Bank* v. *Young*, 43 N. H. 457, 462; *Jones* v. *Pierce*, 35 N. H. 295. "When a creditor disposes of personal property mortgaged to him by the principal as collateral security, he is responsible to the surety for ordinary care and prudence in the sale and in the application of the proceeds." *Bank* v. *Young*, *supra*. The bank by its acts has assumed that it could do whatever it pleased with the proceeds of the attachment, without regard to the rights of any other person. That the plaintiff, if he had had knowledge of the attachment, would have availed himself of his legal privilege relative to the satisfaction of the note and the assuming of his rights under the attachment there can be no doubt, as the course subsequently pursued by him on his first learning about the attachment goes to show. And neither is there any question that he could have protected himself at the time. "It is a doctrine of equity, that the surety is entitled to all the remedies which the creditor has against the principal." Byl. Bills (6th ed.) 373.

*Barney* v. *Clark*, 46 N. H. 514, goes further than *Bank* v. *Rogers*, *supra*, by stating the rule more broadly than was decided in the earlier case, and by applying it to a more doubtful state of facts. But it does not go so far as the bank wishes the court now to go. For, in the first place, in *Barney* v. *Clark* as in *Bank* v. *Rogers*, an attachment before judgment is what the creditor abandoned, and the court expressly declines to say whether it would have made any difference if judgment had been obtained before the abandonment; and, in the second place, in the later as in the earlier case, the surety knew of the security, and took no steps to protect himself. In *Bank* v. *Young*, 43 N. H. 457, 460—462, *Bellows*, J., says,—"If the creditor chooses to accept such securities, the law will imply that he undertakes to hold them in trust for the benefit of the parties interested, and to use ordinary diligence in the care of them, and, upon payment of the debt by the

surety he is bound to transmit them unimpaired to him.  If he relinquish such securities to the principal, it is well settled that he thereby exonerates the surety, at least to the extent of their value. *Bank* v. *Colcord*, *supra*, and cases cited, although in that case other securities of equal value were substituted.  And the same rule has been applied to the release of a lien acquired by an attachment of the property of the principal.  *Springer* v. *Toothaker*, 43 Me. 381.  Between this class of cases, namely, the release of securities by the direct act of the creditor, and allowing them, by want of ordinary care, to be lost or destroyed, we are unable to perceive any solid distinction.  .  .  .  Several of these cases go to the point that the creditor, having in his hands a negotiable note or bill, as collateral security, is bound to give due notice to indorsers; and this, we think, has always been understood to be the law in New Hampshire."  The last quotation presents at least one case where the creditor is bound to the doing of an act for the protection of the surety.  Further, if the distinction between a mortgage and an attachment, even after judgment, that merely doing nothing will not discharge one but will discharge the other, is to be deemed " solid," it is to be observed that the plaintiff's security in the present case was lost, not by the bank's doing nothing, but by its taking the property on another debt of its own.  *Sprigg* v. *Bank*, 10 Pet. 257 ; *Rees* v. *Berrington*, 2 Ves. Jun. 540 ; *Bulteel* v. *Jarrold*, 8 Price 467 ; *Combe* v. *Woolf*, 8 Bing. 161 ; *Bowmaker* v. *Moore*, 3 Price 214—*S. C.*, 7 Price 228 ; *Blake* v. *Wite*, 1 Y. & C. 420.  Why should not the discharge of ample security held by the creditor, and abandoned, also discharge the surety ?  *Bank* v. *Thompson*, 3 Grant Cas. 114 ; Byl. Bills 378 ; *Woodman* v. *Eastman*, 10 N. H. 359 ; *Couch* v. *Waring*, 9 Conn. 261 ; *Wood* v. *Bank*, 9 Cow. 194 ; *Okie* v. *Spencer*, 2 Whar. 253 ; *Bank* v. *Hanrick*, 2 Sto. 416 ; *Newcomb* v. *Raynor*, 21 Wend. 108 ; *Hawkins* v. *Thompson*, 2 McLean 111 ; *Mayhew* v. *Crickett*, 2 Swanst. 190 ; *Smith* v. *Winter*, 4 M. & W. 467.

There are no equities on the side of the bank.  Either the bank or the plaintiff must stand the loss occasioned by the failure of Dearborn, and the situation was such that, although one was holder and the other endorser, whichever moved first would throw the loss on the other, provided no advantage once gained was lost by carelessness.  Thus, the plaintiff could have paid the note, taken it, and sued Dearborn, and so have come out whole, while the bank would have suffered by not being able to find property to secure its other debts, or the bank could have attached all of Dearborn's property on other debts, and have collected this note of the plaintiff, and he would evidently have no redress.  These rights of a first attachment over a second are not such as courts need to strain themselves to protect.  They are gained by diligence, and may be easily lost by neglect.  On the officer's returns as they stand, the defendants had, however inadvertently, relin-

quished a part of the advantage of the bank, and given the plaintiff a right to pay the note and be subrogated.

An attachment is spoken of as a statute lien in many cases, of which the following are cited: *Howard* v. *Daniels*, 2 N. H. 137; *Dunklee* v. *Fales*, 5 N. H. 527; *Burnham* v. *Folsom*, 5 N. H. 568; *Kittredge* v. *Bellows*, 7 N. H. 399, 427; *Clark* v. *Morse*, 10 N. H. 236; *Collins* v. *Brigham*, 11 N. H. 420; *Wheeler* v. *Emerson*, 44 N. H. 182, 186; *Kidder* v. *Tufts*, 48 N. H. 121; *Bryant* v. *Osgood*, 52 N. H. 182; *Rowe* v. *Page*, 54 N. H. 190; *Moore* v. *Kidder*, 55 N. H. 488; *Nihan* v. *Knight*, 56 N. H. 167; *Taylor* v. *Lumber Co.*, 58 N. H. 369; *Connor* v. *Follansbee*, 59 N. H. 124; *Haley* v. *Thurston*, 60 N. H. 204; *Dodge* v. *Beattie*, 61 N. H. 101; *Philbrick* v. *Shaw*, 63 N. H. 81. An attachment was held to be a lien or security within the proviso of the bankrupt act of 1841. *Kittredge* v. *Warren*, 14 N. H. 509; *Kittredge* v. *Emerson*, 15 N. H. 227; *Buffum* v. *Seaver*, 16 N. H. 160; *Peck* v. *Jenness*, 16 N. H. 516; *Colby* v. *Ledden*, 17 N. H. 273; *Peck* v. *Jenness*, 7 How. 612. It is a lien or security within the rule that entitles a surety paying the debt to the benefit of such. *Brewer* v. *Franklin Mills*, 42 N. H. 293. It is a sufficient lien to sustain a bill in equity to set aside a fraudulent conveyance. *Dodge* v. *Griswold*, 8 N. H. 425; *Ferson* v. *Monroe*, 21 N. H. 462; *Tappan* v. *Evans*, 11 N. H. 311; *Kittredge* v. *Warren*, 14 N. H. 509; *Stone* v. *Anderson*, 26 N. H. 506. A release of an attachment is a sufficient consideration for a promise. *Dearborn* v. *Sawyer*, 59 N. H. 95.

An attachment is to be treated, so far as respects the duty of the creditor to a surety, like a mortgage, pledge, or other security, except for the differences that naturally result from their different nature.

A discharge of an attachment at a time when its continuance does not expose the creditor to immediate expense or risk, like the discharge of a mortgage under similar circumstances, discharges a surety. *Springer* v. *Toothaker*, 43 Me. 381; *Bank* v. *Young*, 43 N. H. 457, 461. When a creditor discharges an attachment because its continuance would expose him to risk or expense, it is to be treated like the surrender of a pledge under like circumstances. The necessity of keeping possession of the property in order to maintain the lien and the lack of right to use it, unless for its own preservation, are alike: the right to turn the property into money by a sale exists in both cases, though with varying limitations, sometimes to the advantage of one kind of lien, sometimes of the other: in each case the property may be a source of expense till sold: in each case adverse claims may make it imprudent to run the risk of attempting to maintain the lien. In each case, therefore, circumstances may justify an abandonment of the security, and it is possible that notice to the surety of an intention to abandon it might in either case justify an abandonment which without such notice would have discharged the surety. The

exact limits of the doctrine are not here material. The point is, that the cases are parallel, and that there can be no more difficulty in the one case than in the other in determining such questions as may arise.

When a creditor allows an attachment to be lost simply by not entering his action, or by not levying within thirty days after judgment, it is to be treated like the loss of a mortgage security from the omission of some act, such as getting the mortgage recorded, or taking measures to prevent the waste, or removal and loss, of the mortgaged property. It is, then, a question whether there was such negligence as to discharge the surety; and difficult questions may be presented, but not more difficult in the one case than in the other. There is no reason for classing attachments apart from all other liens, and saying of every other lien that a release of it discharges the surety unless the creditor can show that the circumstances made it unreasonable to require him to hold it, but saying of an attachment, [as matter of law that it is unreasonable* to require the creditor to retain it, and that a release does not discharge the surety. The fact that there is no right to use attached property unless for its preservation is immaterial. The same is the case with a pledge and most other securities, in the absence of agreement.

The fact that an attachment may be lost by mere lapse of time without any act on the part of the creditor is immaterial. If a statute should make the recording of a mortgage essential to its validity even against the mortgagor, would any one pretend that the creditor could discharge the mortgage before the time for recording it had run out without discharging a surety? Whether the creditor would be obliged to take the mortgage to the proper office and pay for having it recorded, in order to hold his claim on the surety, we need not discuss: he should at least leave the surety his chance to come in, pay the debt, and have the mortgage recorded for his own benefit before the time runs out.

If the bank had simply allowed the thirty days after judgment against Dearborn to run out, and the money had then been taken by subsequent creditors, or had been taken by Dearborn himself, and got out of the reach of attachment, we could not on these principles recover without showing that it was an act of such negligence as to be analogous to the cases where the benefit of a mortgage or of a pledge is lost by negligence, and a surety held to be discharged thereby. But the case presented is that of a discharge of the attachment, and taking the property on another claim—an act which is fully analogous to the discharge of a mortgage or surrender of a pledge, unless, perhaps, it is stronger in our favor.

*F. N. Parsons*, for the defendants on their motion for rehearing. The attachment made in the suit in which the plaintiff's note was included was lost by the failure of the bank to levy thereon within

thirty days after judgment. G. L., *c.* 235, *ss.* 36–38. At the time of the payment by Morrison, no attachment existed to which he could have been subrogated if he had stipulated therefor and had the right. The question is, not whether Morrison had the right upon payment to be subrogated to any suit of the bank then in existence, and to prosecute the same in the name of the bank for his protection, but is, whether the failure of the bank to prosecute its suit to final levy was such a failure of its legal duty toward the indorser as to discharge him.

I. To overrule the demurrer, it must be held,—(1) An indorser who obtains the discount of a note in the ordinary course of business is a surety so as to be discharged by the failure or negligence of the creditor in his care of any collateral securities held by him to the same extent and in the same way that a surety would be. (2) An attachment is such a collateral security that a failure by the creditor to prosecute a suit against the principal, in which it was obtained to final levy, discharges the surety. I deny each of these propositions. If either is unsound, the demurrer must be sustained.

II. Under the decisions in this state, the release of an attachment by the creditor in a suit against the principal debtor, even after judgment, will not discharge the surety. *Barney* v. *Clark,* 46 N. H. 514; *Baker* v. *Davis,* 22 N. H. 37; *Bank* v. *Rogers,* 16 N. H. 9; *Baker* v. *Marshall,* 16 Vt. 522; *Bank* v. *Dixon,* 4 Vt. 587; *Bellows* v. *Lovell,* 5 Pick. 307.

The weight of authority sustains the proposition, and there are good and sufficient reasons why an attachment lien should be distinguished from others. (1) I do not claim that an attachment is not a lien. *Edgerly* v. *Emerson,* 23 N. H. 555, establishes that an attachment is such a collateral security, that a surety, on payment of the debt, may be subrogated thereto. It is not an authority that an attachment is such a collateral security that the loss ·or release of it by a creditor discharges a surety. (2) The assertion that no satisfactory reason has ever been given why the release of an attachment lien upon the property of the principal should be distinguished from that of any other lien, is not sustained by the authorities cited. Against the authorities cited in New Hampshire, Vermont, and Massachusetts, where the lien by attachment exists, we are referred to cases in Georgia, Maryland, Alabama, and Ohio, where the lien by attachment does not exist. The authorities cited are not cases of attachment, but where the property has been actually taken on execution. *Freaner* v. *Yingling,* 37 Md. 491, so far as it is an authority at all, is an authority against the proposition to which it is cited. *Hollingsworth* v. *Tanner,* 44 Ga. 11, is mere *dicta* on this point. The case is decided the other way on other grounds. In *Dixon* v. *Ewing,* 3 Ohio 280, the property was actually taken on execution. The value of this case as an authority is weakened by the reference in the reporter's head notes to 3

Wheaton as a *contra* authority, since the decision of this case.  In *Bank* v. *Edwards*, 20 Ala. 512, the decision is put on the ground that the execution was actually levied, and the peculiar circumstances of the case.  The case is an authority for the defendants here.  See, also, 6 Ala. 572; 15 Ala. 309, 616.  (3) If the attachment lien is to be held a species of collateral security to enable a surety to be subrogated to and prosecute a pending suit, to hold that a creditor must prosecute a suit in which he has obtained an attachment or release the surety, is to hold that, having collateral security, he must enforce it.  This is not the law.  Sheld. Sub., *s.* 115; *Bank* v. *Godden*, 15 Ala. 616.  If it is said that this is the result of the nature of an attachment, that it must be prosecuted to make it available, my answer is, that it is this very nature of this sort of a security, which is of no avail without the active pursuit of the debtor by the creditor, which he is not obliged to undertake or pursue, which gives the creditor the right to release or abandon it.  (4) In jurisdictions where it is held that a creditor is bound to sue the principal upon or without the request of the surety, it may reasonably be held that the release of an attachment discharges the surety.  But when a creditor, as in this state, is under no obligation to sue the debtor, and is also under no obligation to realize upon collateral security of any sort, it seems to me to follow as an unanswerable proposition, that if the creditor is under no obligation to collect of the principal or his securities, he is under no obligation to bring suit; that if he is not obliged to bring a suit or realize upon any collateral securities, he is not obliged to prosecute a suit already brought to gather the fruits of an attachment therein; that if a failure to bring suit will not discharge a surety, a failure to prosecute one already brought will not do so.  Hitherto this court has so held.  At what precise point in a suit is failure to prosecute to be logically held to discharge a surety?  How far may a creditor go safely in a suit?  May he sue out a writ, and try to scare the pay out of the principal?  Will it be safe for him even to threaten to sue the principal, and not do it?  Or is it to be said he cannot stop after taking judgment?  There is where the trouble comes.  It is no answer to say this property had been sold and converted into money.  That changes no one's rights.  The debtor could claim it was exempt, and demand the proceeds.  Other claimants may arise: the sale estops no one.  After making the misstep of taking out judgment, can the surety compel the creditor to take the risk involved in seizing property?  Is there any logical reason why a failure to do this should discharge a surety, when a failure to take out judgment would not?—any reason why a failure to take out judgment should discharge a surety, when a failure to enter the writ would not?—any reason why either of these should discharge a surety when it is held that a failure or refusal to bring suit does not?  (5) The banks had the right to take all of Dearborn's property upon their

unsecured claims, and collect the remainder of their claims of the various sureties. Neither law nor equity requires that payment so collected shall be considered to be made for the benefit of all the sureties ratably. Sheld. Sub., *s.* 117; *Harding* v. *Tifft*, 75 N. Y. 461; *Hansen* v. *Rounsavell*, 74 Ill. 238. (6) When the attachment was made simultaneously upon all the writs, the property attached became one security for the payment of all the debts of Dearborn due both banks, and the banks had the right to apply the security on such claims as they chose. The holder of different notes, for which he has one security, may apply the whole proceeds of the security upon the notes last due, and continue to hold a surety upon the earlier ones. Sheld. Sub., *s.* 117; *Mathews* v. *Switzler*, 46 Mo. 301. (7) At the most, Morrison, if surety at all, was only surety for a part of the debt for which the attached property was liable. And a surety for part of a debt cannot be subrogated while the other part remains unpaid. Sheld. Sub., *s.* 118. (8) The application was made by the levy. The return of the attachment making the other writs secondary was not an application. The attachment gave the bank no power or control over the fund; they had none until the levy. The fact that the sheriff returned the writs in a certain order does not bind the bank to pursue that order in making the application and levy. This is not a case of one completed attachment and then another second attachment made, but is a case where all the attachments are made at once; and the plaintiff in this case rests his claim upon a fiction of the law. When a sheriff has writs of different plaintiffs, his return may serve to indicate the order of priority between them; but when the writs are all in favor of one plaintiff, any such return is a mere nullity, binds no one, and is not conclusive for or against a stranger. (9) Even if the return were made as it is by direction of the bank, it is not an application of the proceeds. It amounts at most to an unexecuted intention to apply them in this order. The application is made by the levy. Suppose it had been expected that Dearborn was to make a general payment to the bank upon his indebtedness, and the officers had voted to apply this payment upon certain notes, say the plaintiff's: would the plaintiff have been discharged if, before the payment was made, the officers of the bank had reconsidered this vote, and voted to make the application upon other notes, and so made it? That is this case, and one record would be as important and binding as the other, and no more.

*C. B. Hibbard* and *S. S. Jewett*, for the plaintiff, in reply.

1. The defendants say that "the attachment made in the suit in which the plaintiff's note was included was lost by the failure of the bank to levy thereon within thirty days after judgment."

If this statement means that the attachment continued to exist till the thirty days after judgment had expired, although the pro-

ceeds of the attachment had in the meantime been applied on exe-
cutions obtained in other suits, it rests on a misconception of what
is meant by the discharge of an attachment.    No writing, no for-
mality of any kind, is necessary.    If the creditor tells the officer to
give the property back to the debtor, if he tells him to deliver it
over to another officer who has a writ or execution to take it on,
if he tells him to apply it all on other executions, the officer is justi-
fied in following the directions; and when he has done so, the prop-
erty is out of his hands, or is in his hands for some other purpose
than holding it on the attachment.    The attachment is discharged.
The bank could in no way have more effectively discharged this
attachment than by having its other executions levied upon the
property.

2. That the plaintiff could not, by paying merely the note he had
endorsed, have become entitled to subrogation of the judgment and
attachment against Dearborn, is not material.    No doubt he would
have had to take up the whole judgment; but nothing appears to
show that he would not have done so, especially as there was enough
money in the officer's hands to satisfy the entire execution, so that
he would then have lost nothing.    It is immaterial, however,
whether he would have availed himself of the security or not, if it
was discharged so that he could not avail himself of it.    Since the
security is now discharged, he is of course under no obligation to
do anything about the other notes included in the judgment in
order to get the benefit of his release.

3. The doctrine, that when a sheriff has several writs in favor of
one plaintiff, a return indicating the order of priority among them
is a mere nullity and binds no one, leads to the doctrine that two
plaintiffs may by agreement change the order of their attachment
liens, although there is a surety on the claim first secured who
wishes to pay the claim and prosecute the suit.    The priority estab-
lished by the order of attachment is one of writs, not of persons,
and is therefore not destroyed by identity of persons.    So far as
the debtor is concerned, the ·plaintiff in the writ with the prior
attachment may waive its priority in favor of a second attachment
made by himself or made by another; but we submit that he can-
not so waive it in either case to the prejudice of sureties on the
claim first secured, or of any other person, that would have a right to
complain if the attachment were entirely released.    So far as the
claims secured by one attachment are concerned, the plaintiff may
of course apply the proceeds the same as he might apply a pay-
ment made on those claims generally to such of them as he chooses,
and sureties cannot complain.    But where an order of priority is·
established, the plaintiff is bound to regard it, whether it is himself
or another that would gain by disregarding it.

4. That an unexecuted intention to obtain security or to apply
it in a certain way can be changed without releasing sureties is not
disputed.    A number of the cases cited by the defendants are of

this character. When the creditor has obtained his security, and in writing elected how to apply it, the case is changed. A vote by the bank to apply a payment not yet made is in no respect an application of the payment at the time of the vote. If it were, the claim would be paid without the formality of payment. If the payment had already been made, or if the vote stood unrescinded at the time of the payment, probably the application would be final, even as between the bank and the principal debtor. The situation of a bank that has the debtor's promise of a payment, and passes a vote how to apply it when made, is analogous to the situation of a plaintiff that has given his writ to an officer with directions to attach certain property thereon, but in no respect analogous to that of a plaintiff that has an attachment already made.

*C. B. Hibbard* and *S. S. Jewett*, for the plaintiff, on his motion for a rehearing. That a surety has a right of subrogation to securities acquired by the creditor, and that he is discharged *pro tanto* by the creditor's surrender or improper application of them, are well established in this state, and as general propositions are not openly disputed in the present case. *Bank* v. *Colcord*, 15 N. H. 119; *Bank* v. *Rogers*, 16 N. H. 9; *Watriss* v. *Pierce*, 32 N. H. 560; *Bank* v. *Young*, 43 N. H. 457. That no securities properly so called (that is, such as cannot be regarded as payment) come within the second proposition unless they also come within the first, is clear on principle, since the surety is not injured by the surrender of a security of which he could not avail himself, and is also clear on authority. Sheld. Sub., *s.* 119. That no securities come within the first proposition that do not also come within the second, unless there is some equitable reason for exempting them from the second that does not exist for exempting them from the first, is likewise clear, since the second proposition results from a combination of the first with the proposition that the creditor must not render the surety's rights unavailable.

An attachment is a security within the first proposition. *Edgerly* v. *Emerson*, 23 N. H. 555; *Brewer* v. *Franklin Mills*, 43 N. H. 292; *Chester* v. *Plaistow*, 43 N. H. 542. It is therefore a security within the second proposition, unless there is some equitable reason for excepting it. No such reason has been suggested in any case heretofore decided in this state, and none has been suggested in the present case. In *Bank* v. *Young*, 43 N. H 457, the decision in *Springer* v. *Toothaker*, 43 Me. 381, that the surety is discharged by the release of an attachment on the principal's property, is mentioned with apparent approval. In *Baker* v. *Davis*, 22 N. H. 27, 37, *Perley*, J., appears to have had an impression that a levy might be abandoned without discharging the surety. These opinions are both *obiter*. In *Barney* v. *Clark*, 46 N. H. 514, *Bartlett*, J., mentions the question whether the surety would be discharged by the release, after judgment, of property that had been

attached in the suit, but expresses no opinion upon it, and we think it cannot be inferred from the authorities cited by him what his opinion was.    The decision in *Barney* v. *Clark* was, that the creditor might withdraw a note from a suit against the principal, wherein property of the principal had been attached, without discharging the surety.    The note was not specially declared on, and it does not appear that the note was in the suit in any way except that the plaintiff's attorney had intended to introduce it under the money counts.    The court treated the withdrawal of the note as equivalent to the discontinuance of a suit upon it, and it is impossible to give it any greater effect.    The decision is, therefore, at the utmost, the same as in *Bank* v. *Rogers*, 16 N. H. 9, which is cited by the court.    The ground of this decision is not stated in *Barney* v. *Clark*, but is very fully stated in *Bank* v. *Rogers*, which latter case is, therefore, not only the first case, but still the leading case on the subject.

In *Bank* v. *Rogers*, the surety's rights to the benefit of security taken by the creditor from the principal debtor, and his discharge *pro tanto* by the creditor's release of it, are fully recognized.    A judgment lien is mentioned as a security to which the surety has this right, and the question whether an attachment is such a security is suggested but not discussed.    The effect of a naked release of either an attachment or a judgment lien is not mentioned, but it is held that the creditor may discontinue the action against the principal without discharging the surety, whether an attachment had been made or not.    The real point of this decision can perhaps be best understood by supposing an analogous case to arise where the security is a pledge or a mortgage.    Suppose the creditor having a pledge or a mortgage of property from the principal debtor begins proceedings to foreclose it, either by suit or by notice and advertisement of sale, where the latter is permitted by the contract or by law: that he has an equitable right to abandon the proceedings, is well settled, coming within the ordinary principle, that the creditor is not obliged to take active measures to enforce the security, or even to persist in them when undertaken.    The decision in *Bank* v. *Rogers* is, that he might still abandon the proceedings, even if the effect of such abandonment were to lose the security.    The equity of the creditor to proceed or not proceed, to prosecute or abandon proceedings already begun, exactly as he chooses, is held to be paramount.    If there is a security that is of such a nature as to be lost by his mere discontinuance of proceedings begun to enforce it, it is not lost by the creditor's direct act; it is incidentally lost by his ceasing to prosecute the proceeding necessary to preserve it, and the surety is not discharged.    This may be considered as established in this state, although it is against the general current of authority elsewhere, especially in jurisdictions where an attachment is held (as it is here) to be a collateral security of which a surety is entitled to subrogation.    Sheld. Sub., *s.* 122.

But the release of an attachment, while still prosecuting the suit wherein it is made, is entirely different in principle, is unjustified by anything to be found in *Bank* v. *Rogers*, or in any other New Hampshire case except the *dictum* in *Baker* v. *Davis*, and is strictly analogous to the release of property pledged. Probably, in a case where there were threatening adverse claimants, as in *Bank* v. *Rogers*, the creditor would have a right to abandon either an attachment or a pledge; but in the ordinary case he must certainly retain property pledged, and no equitable reason can be given for not requiring him to retain property attached so long as he continues to prosecute the suit wherein it has been attached.

After judgment, there is no way, so far as we are aware, to abandon the action except by a release, and a release would discharge the original debt and discharge the surety. If, however, there is any way to discontinue an action after judgment without releasing the debt, we do not dispute that *Bank* v. *Rogers* and *Barney* v. *Clark* are authorities tending to establish that such a discontinuance would not discharge the surety, although there was property attached; but an opinion on that question was expressly reserved. It is immaterial here, since the judgment against Dearborn was not abandoned.

Of the cases outside of this state, the great majority are in our favor. Sheld. Sub., *s.* 122. Bayl. Sur. & Guar. 231; 5 Wait Act. & Def. 245. Indeed, after the rejection of those that conflict with *Edgerly* v. *Emerson*, few are left against us. We purpose to consider only the New England cases that have been cited in the present case. The *dictum* in *Bellows* v. *Lovell*, 5 Pick. 307, goes no further than *Bank* v. *Rogers*, namely, that the creditor may abandon an action, although an attachment is thereby lost. The doctrine of *Bank of Montpelier* v. *Dixon*, 4 Vt. 587, is, that " as to any securities which the creditor may have at the time the surety entered into the obligation, and which may have had an influence in inducing the surety to become obligated, the creditor must act with good faith, and not discharge them to the prejudice of the surety," but that the creditor may release any security obtained by him *after the contract of suretyship* for his own benefit and without any request of the surety, if in making such release he act with good faith and with a view to his own interest. The latter part of this statement of the doctrine of the case is not in the case itself expressly stated of any security except attachments; but the reasoning is general, applying to any other security as well as to attachments. This is the construction which has been put upon the case by the same court in *Crane* v. *Stickles*, 15 Vt. 252, where the security in question was a bill of sale of personal property; and the court says, of *Bank* v. *Dixon*, that it " seems to recognize the doctrine that security may be relinquished and the undersigner pursued to the fullest extent. The payee of the note may give up such security as he may have obtained, at his own sug-

gestion, without any assistance from the surety, provided he acts in good faith and only with reference to his own interest." This does not accord with the law as generally held (Sheld. Sub., *s.* 119), or as held in New Hampshire (*Bank* v. *Young*, 43 N. H. 457, *Philbrick* v. *Shaw*, 61 N. H. 356, where the securities were taken after the contract of suretyship and without the sureties' request), and no Vermont case can, therefore, be an authority in New Hampshire on this subject. *Baker* v. *Marshall*, 16 Vt. 522, moreover, goes no further than *Bank* v. *Rogers*.

The only New England case, so far as we know, that admits the general doctrine that the discharge of securities is a discharge of the surety, although such securities were acquired by the creditor after the contract of suretyship was entered into and without the request of the surety, and decides whether an attachment is or is not a security within the rule, is *Springer* v. *Toothaker*, 43 Me. 381, and that case decides that it is such a security. If, therefore, the court should adopt the defendants' suggestion that the decisions in jurisdictions where the lien by attachment exists should control the case, the decision must be against them. The Maine and Vermont cases recognize no distinction between attachments and other securities, while the Massachusetts and the New Hampshire cases do not touch the question, except *obiter* in *Baker* v. *Davis* and in *Bank* v. *Young*, the opinion of *Perley*, J., that a distinction exists being based on a misunderstanding of the authorities cited by him, while the opinion of *Bellows*, J., that no distinction exists, is supported by the authority he cites. The decisions that the creditor may discontinue an action although an attachment is lost thereby, do not touch the subject, because expressly put upon the ground that the creditor cannot be compelled to prosecute the action. They are not decisions that the creditor, while prosecuting an action, may do whatever he pleases with securities obtained therein and not discharge a surety. Because the equitable right of the creditor to discontinue the action overrides the equitable right of the surety to have securities preserved, it by no means follows that the creditor is not in general bound to respect that right of the surety.

The decisions relied on by the defendants rest on an equitable principle, that the surety ought not to be allowed to escape his liability by reason of the creditor's abandoning a proceeding he has undertaken for the collection of his debt from the principal debtor, even though the effect of such abandonment is incidentally to cause the loss of a collateral security. This is an intelligible principle, which can be applied to new cases as they arise, without embarrassment other than that which is incidental to the application of established principles to new cases in any department of the law. It is an equitable principle, though there may be doubt whether it should be made paramount. But the step which the court now thinks of taking is a plunge into the dark. If there is any equita-

ble principle on which it can be based, that principle has not been enunciated in the ingenious arguments of counsel, or of the court in the opinion last delivered, unless the court is prepared to over-rule New Hampshire cases by wholesale. To prove this, we pur-pose to examine every supposed principle on which the decision has been founded.

In the first place, we protest against stating the question as " whether the bank's failure to levy the execution issued on their judgment against Dearborn as maker of the note upon the avails of the attached property discharged the plaintiff from his liability as endorser." This case is before the court on the demurrer of the defendants. The judgment of the court which we are seeking to have reversed was " demurrer sustained." If we are precluded from proving the actual fact that the bank's levy was made after judgment against Dearborn, but before the attachment had expired by reason of the lapse of thirty days after such judgment, on account of having incautiously agreed upon a case from which that fact was omitted, although plainly alleged in our bill and admitted in the answer, and not omitted from the agreed case by agreement as a compromise, but by pure accident and mistake, still it is an unheard-of thing that the fact shall be presumed in favor of the party demurring. There is no incorrect statement on this point in the agreed case ; there is simply an absence of any statement. On demurrer, the fact, on all the authorities we have ever heard of, is to be presumed in favor of the party whose pleading is demurred to. If that presumption is erroneous in the present case (which it is not), the defendants, losing on their demurrer by reason of that error, have their answer to fall back on, can amend it by denying the fact alleged in the bill, and have the benefit of the actual facts.

The question really presented is, whether the creditor's levy of another execution in his own favor on the property attached (or its avails), thereby necessarily releasing his attachment on any other writ, discharges a surety from his liability on a claim on which the earlier attachment had been made.

It is suggested that a surety " is not discharged from liability by the creditor's release of the attachment," to which *Bank* v. *Rogers*, *Baker* v. *Davis*, and *Barney* v. *Clark* are cited. But this is not, by itself and independent of the reasons for it, an intelligible equit-able principle. It is not supported by the cases cited, which decide only that the creditor may discontinue his action although an attachment is thereby released. In *Barney* v. *Clark* the discon-tinuance was after default, but while that may make it a stronger case of the application of the principle, it does not introduce a new principle.

It is further suggested, that " without prejudice to his rights against the surety, the creditor may decline to accept additional security offered to him by the principal ;" that " he is under no

obligation to pursue any of the remedies which the law gives him against the principal, though the surety requests him to do so;" that the creditor " need not prove the debt against the principal in bankruptcy, exhibit the note to the deceased principal's executor, nor if his estate is administered as insolvent present it to the commissioner for allowance." We do not see the bearing of these, unless the court is prepared to hold that whatever a creditor may decline to accept, he may surrender without prejudice to his rights against the surety, and that the omission to discharge an attachment in a suit which is not discontinued is a pursuit of a remedy. The first makes the conclusion somewhat broader than is probably intended ; but one cannot argue about "securities," and then, when one gets to the conclusion, suddenly substitute "attachments" and limit the conclusion to them. The second appears to be a strange use of language, and, if it is correct, it is not clear why an omission to surrender pledged property is not equally a pursuit of a remedy.

It is said that "it is not the creditor, but the surety, who trusts the principal, and it is his business to see that the principal pays. The chief object of the creditor in requiring a surety is to avoid the necessity of resorting to his legal remedies against the principal, to escape the vexation and expense of litigation and cast that burden upon another. The surety contracts, not that he will pay the note in case only the payee cannot by due diligence enforce payment by the maker, but that he will himself pay it when it falls due. If he performs his contract, the creditor has neither cause nor opportunity to institute legal proceedings." These statements support the doctrine that the creditor may refuse to exert himself to collect of the principal, and may refuse to take security of any kind, and they partially support the doctrine that the creditor may discontinue proceedings instituted by him for collection from the principal, whatever may be the effect on any securities ; but they do not apply to the naked release of an attachment, unless they apply also to a release of any kind of security. They either do not touch the case, or they go too far.

It is said that " The lien acquired by an attachment is merely the right to levy the execution when obtained on the particular property attached." What is any lien? A mortgage is simply the right to acquire the property or the proceeds of a sale of it (the same alternative exists in the case of an attachment) by due proceedings. The right of detention by the creditor or by some agent of his (the sheriff in the case of an attachment) exists also in the case of a mortgage and of a pledge of personal property, in addition to the right mentioned. A right to levy an execution on particular property, without regard to intervening claims, is a pretty valuable right, if the property is sufficient and the debt can be established, that is, in the same cases in which a mortgage or a pledge is of value. It is settled to be a collateral security, and a security of which the surety is entitled to subrogation. What more can be

required of it to make it the duty of the creditor to retain it, so long as some other equity does not interfere—some equity that does not exist in the case of a mortgage or a pledge, like that to proceed or not to proceed, according as the creditor thinks for his own advantage?

It is further said that "The plaintiff has no greater right against the principal, and is under no greater obligation to the surety, to levy on the attached property, than on any other equally exposed to levy. The surety is no more injured by the creditor's failure to levy in the one case than in the other. If he is not discharged by the creditor's refusal to levy on the principal's unencumbered property pointed out to him by the surety, who requests him to levy upon it, it cannot be held that he is discharged by a failure to levy on the property attached. In each case alike, the surety may pay the debt to the creditor, and levy the execution for his own benefit." We admit the correctness of all this, so long as the lien of the attachment is preserved. Whether the surety will be discharged if the creditor, after taking judgment against the principal, continues his inaction till the attachment is dissolved by operation of law, is a question not open on this demurrer, and not raised by the actual facts of the case. But the point to be determined when that question shall arise is, whether it is culpably negligent to suffer a lien once acquired to run out so that the surety on payment of the debt cannot avail himself of it, and not whether it is negligent not to resort to means to enforce payment. The final sentence of the last quotation applies to all securities. The surety may pay the debt, and then foreclose for his own benefit a mortgage given to the creditor, or, if he prefers, may attach the property. The statement is true enough, but as an argument it goes too far.

It is said that "If the creditor cannot attach the principal's property without being obliged to levy the execution upon it, the surety is in effect discharged by the attachment." But no one in this case contends that he can be compelled to levy the execution. It would be as pertinent to say, in a case where the security released was a mortgage, that if the creditor cannot take a mortgage of the principal's property without being obliged to foreclose it, the surety is in effect discharged by the taking of the mortgage. The next statement, that "If he attaches lands, he must take his pay in land at its appraised value in place of the lawful money which the surety as well as the principal agreed to pay," is equally chimerical.

It is said that our doctrine might be prejudicial to sureties, because it might tend to discourage the creditor from ncurring the responsibilities imposed upon him by an attachment. Un er *Bank* v. *Rogers*, those responsibilities do not seem to us to be very heavy. But it may be said of any security, that no doubt the creditor sometimes refuses to take it because he is not satisfied with it as a final

resort, and does not wish to embarrass himself by incurring the obligation to retain it.

It is said, finally, that the surety "is chargeable with knowledge that the principal has not performed the contract, if such is the fact. The creditor is in no case bound to inform him that the debt is not paid. The plaintiff might have had the full benefit of the attachment by performing his contract, and paying the debt at any time while it subsisted. It is no answer for him to say that he did not know the bank had sued Dearborn or made the attachment. The bank was under no obligation to sue Dearborn and attach his property, or to notify the plaintiff that such action had been taken. Service of the writ upon the plaintiff was notice that the debt had not been paid. He was put on inquiry touching all the facts relating to his liability. Ordinary care would have informed him of the suit against Dearborn and of the attachment. His loss is caused, not by any act of the bank, but by his own breach of the contract in not paying the note when it fell due and by his subsequent negligence." Is there any one of these statements, or any consequence that can legitimately be deduced from them, that would not have the same force and the same application if the security released had been a pledge or a mortgage ? If so, we cannot see the distinction.

No general principle has been suggested, either well grounded on authority or not, for the decision of this case for the defendants, except principles that subvert the whole law of the subject and overrule numerous cases in this state as well as in other jurisdictions. Suppose the proposition, that a surety is not discharged by the release of an attachment, is taken as itself the principle, that is, that it shall stand as an isolated case, an exception to the general principle that a surety is discharged *pro tanto* by a release of collateral securities : where does that leave the general principle? An exception without a reason for it, an exception not based on some other principle, destroys the principle and leaves the decisions supposed to establish it as so many isolated and unclassified special cases. The different cases that have been decided on that principle will remain authority on their particular state of facts, though that authority will be weakened, but, until a new principle has been discovered and enunciated by the court, a principle that includes the old cases and the exceptions, everything is at sea.

Suppose the next case that arises concerns a vendor's lien on furniture: the surety is probably entitled on paying the debt to be subrogated to the lien, for that rests on a broad equitable principle not directly attacked in this case,—a principle that applies to every kind of collateral security, even an attachment. But will he be discharged by the vendor's surrender of the lien, or by his levying on the furniture to satisfy another debt? That question cannot be answered except by the court. It may be that the court will say that the case is analogous to other liens, and that the

surety is discharged to the extent of the value of the furniture thus surrendered or misappropriated.   On the other hand, it may be that the court will say that it was the surety's own fault that he did not get the benefit of the security ; that it was his duty to pay the debt, and then he could have been subrogated to the lien and have gotten the benefit of it; that the lien amounts to nothing but simply the right to take back the furniture, or to sell it on due proceedings (according to what the particular contract was), and that the creditor should not be obliged to take his pay in furniture, when the surety as well as the principal had promised to pay him in money, or should not be compelled to incur the expense of keeping, advertising, and selling it; that the vendor is under no more obligation to retake this furniture than he is to attach some other furniture (beyond the statutory exemption) which the debtor happens to own ; that, if the creditor cannot reserve a lien on furniture without being obliged to enforce it, the surety is in effect discharged by the reservation of the lien,—and so on, with the other arguments advanced in this case, nearly every one of which is as applicable to the one case as to the other.

CARPENTER, J.   The case comes up on a demurrer to the plaintiff's bill, with an answer and an agreement that " the allegations of the bill and answer are to be taken as facts, except where it is otherwise specifically agreed."   It is considered as if all the undisputed facts were alleged in the bill.   Upon the whole case, some of the material facts are left in doubt.   The view of them most favorable to the plaintiff is this: April 12, 1881, the defendant bank brought against Dearborn (1) an action to recover a promissory note on which the plaintiff was liable as indorser, and caused Dearborn's property to be attached, (2) several other actions on unsecured demands in which the same property was attached subject to the former attachment, and (3) an action against the plaintiff as indorser.   The property attached was sold on the writs by consent of the parties, and the avails held by the officer for application according to law.   G. L., c. 224, ss. 19, 38.   October 5, 1881, the bank obtained judgment in all the suits.   The avails of the attached property were insufficient to satisfy the judgments.   The bank placed the executions issued on the judgments founded upon their unsecured demands in the hands of the officer, who within thirty days after the judgments were rendered, and (as the plaintiff says) on the third day of November, 1881, by the bank's direction, applied upon them 'the avails of the attached property, leaving them partly, and the judgment on the indorsed note wholly, unsatisfied. On the 25th day of March, 1882, the plaintiff, in ignorance of the foregoing facts except of the action against himself, paid the judgment against him, and by his bill seeks to recover of the bank the amount so paid.

It is assumed without inquiry that the plaintiff stands in the

position and has all the rights of a surety, though, so far as appears, he indorsed the note and procured it to be discounted by the bank in the ordinary course of business. *Duncan* v. *Bank*, 11 Ch. Div. 88—*S. C.*, 6 App. Ca. 1; *Hurd* v. *Little*, 12 Mass. 502; *Pitts* v. *Congdon*, 2 N. Y. 352. A surety, upon payment of the debt, may take an assignment of the creditor's judgment and execution, or of his pending action against the principal, and for his own benefit prosecute the action against a defence made by the principal's subsequent attaching creditors, levy the execution upon the property attached, or, by suit in the attaching officer's name, recover it of the receiptor. *Edgerly* v. *Emerson*, 23 N. H. 555; *Brewer* v. *Franklin Mills*, 42 N. H. 292. In both of these cases the assignment was voluntarily made by the creditor, who in neither case had any interest in or claim upon the property attached, except for the security of the debt paid by the surety. Though the question has never been determined in this state, it may be that equity would compel the creditor to make the assignment, or would subrogate the surety to his rights without an assignment in cases of this character. The subsequent attaching creditors and the receiptor are not injuriously affected by the subrogation; they remain in the same position they would occupy, if, without the intervention of the surety, the creditor pursued the action and made the levy, and no one else has apparently any cause to complain. Whether the surety, on payment of the debt, would be entitled to a like assignment of, or subrogation to, the rights of a creditor who has on the same property subsequent attachments for the security of other demands which it is insufficient to satisfy, so that either he or the surety must suffer loss, is a different question.

The plaintiff has no reason to complain of the agreement between the two banks. As to him, his case stands as if all the sued demands against Dearborn were the property of the defendant bank. Dearborn's property was insufficient to satisfy all of them. As between him and the bank, it was immaterial which of the attachments was first. By them the bank acquired the legal right to apply the attached property on their judgments, not merely in the order of the attachments, but in such order as they pleased. They could apply it on the judgment in the last as well as in the first attachment suit, or *pro rata* on all the judgments, or in such other manner as their interest required. This right of appropriation was a valuable part of their security. It is as if Dearborn had delivered the property to the bank in pledge, with express authority to sell it and apply the proceeds in satisfaction of such of their claims as they might see fit; or as if he had given the bank a mortgage of the property to secure all their demands, without stipulating for its application on any one of them in preference to another. The plaintiff, by paying the debt on which he was liable, could not deprive the bank of the right to apply the property at their election on the other debts. In order

to entitle himself to the benefit of the security, he was bound to pay all the debts for the payment of which it was held by the bank. *Gannett* v. *Blodgett*, 39 N. H. 150, 153, 154, and cases cited. The assumption that the plaintiff had a lien on Dearborn's property superior to the bank's second attachment, has no foundation in law or in fact. He had in truth no lien by attachment or otherwise, but merely the equitable right to acquire by subrogation the security obtained by the bank by attaching that property. If this right of acquisition could properly be called a lien, it had no priority over the attachment lien held by the bank. The equitable right of the bank to the application of Dearborn's property to the satisfaction of their unsecured claims against him was at the least equal to that of the plaintiff to have that property appropriated to the payment of the debt for which he was Dearborn's surety. By the attachment the bank acquired in addition the legal right. "When two or more have equal claims in equity and one has the legal title, the legal title shall prevail." *Eastman* v. *Foster*, 8 Met. 19, 29. The surety's right of subrogation to securities held by the creditor is subordinate and not superior to the rights of the latter. His right is, to be put in the same position as the creditor, not in a better one. He cannot have the benefit of the security without assuming the burden to which it is subject,—without discharging the indebtedness for the payment of which it is held. His right rests not upon contract, but upon principles of natural justice. *Hayes* v. *Ward*, 4 Johns. Ch. 123, 130. It would be unjust to permit him, on payment of part of the debt or one of several debts, to appropriate to the satisfaction of such debt or part of a debt a security which the creditor holds for the satisfaction of the entire indebtedness. It would be putting him, not in the same position as the creditor, but in a better one. It would tend to "defeat the object and end of suretyship," and might in some cases place the creditor in a worse position than he would occupy without a surety. *Gannett* v. *Blodgett*, 39 N. H. 150, 154, 155. To hold that the plaintiff on payment of his debt only was entitled to be subrogated to the attachment, is to hold that he could compel the bank to appropriate the attached property to the satisfaction of that debt, and deprive them of their right to apply it on the other debts. It is to hold that the vigilance of the bank in obtaining the attachment security is to operate, not to their advantage, but to that of the plaintiff. If Dearborn had made to the bank a general payment on their claims against him without appropriating it to any particular debt, or had made it with express authority to the bank to apply it on such of his debts as they chose, the plaintiff could as equitably ask that they be compelled to apply it on the debt for which he was liable. *Stamford Bank* v. *Benedict*, 15 Conn. 437, 445. The bank had the legal and equitable right to appropriate the attached property to the satisfaction of any of the claims secured by the attachments. The plaintiff could have acquired

the bank's interest in the property by paying what equity would require him to pay. An assignment to him of that interest would not be equitable until he paid the debts for the payment of which the bank had obtained security by their attachment. *Brown* v. *Ray*, 18 N. H. 102, 104; *Gannett* v. *Blodgett*, 39 N. H. 150; *Kidder* v. *Page*, 48 N. H. 380, 382, 383; *Belcher* v. *Bank*, 15 Conn. 381; *Bank* v. *Benedict*, 15 Conn. 437, 444, 445; *Root* v. *Stow*, 13 Met. 5; *Society* v. *Snow*, 1 Cush. 510, 518; *Wilcox* v. *Bank*, 7 Allen 270; *Farebrother* v. *Wodehouse*, 23 Beav. 18.

But assuming that the law were otherwise—assuming that the plaintiff on payment merely of his own debt at any time during the life of the attachment, might, had he chosen to do so, have availed himself of the attachment lien, and might have levied the execution for his own benefit on the attached funds—the result is the same. The plaintiff did not pay the debt in the lifetime of the attachment, nor until long after it expired by operation of law. He did not refrain from paying, and from asserting a right to the lien by reason of anything done by the bank. It distinctly appears not only that he never acquired the right of subrogation to the attachment lien, but also that he never would have acquired it if the lien had continued in force as long as the law permitted. The question is, whether upon these facts the plaintiff was discharged from liability by the bank's failure to levy the execution founded upon the note indorsed by the plaintiff on the attached property, or by the application of the property on their other executions. If the bank were under no obligation to apply the funds on the indorsed-note judgment, the plaintiff cannot complain because they were not so applied. On the other hand, if the bank were bound to apply them on that judgment, the plaintiff, by their neglect to do so, was discharged from liability, and is entitled to recover the money paid on the judgment against him as paid by mistake. In either case, it is not material to him that the funds were applied on other judgments in favor of the bank. His complaint is, not that the bank have got the funds rather than any one else, but that by their action, or by their non-action, he has been deprived of them. His injury, if any he has suffered, and the bank's liability, are the same as they would have been if the funds had been lost by the bank's negligence, or if the judgments on which the bank applied them had been in favor of strangers instead of the bank. The bank's application was no wrong to the plaintiff, unless at the time of the application it was his right to have it made elsewhere. As against everybody except him, the bank had an unquestionable right to apply the funds on the indorsed-note judgment, or on the other judgments, at their election. The actual application was merely conclusive proof of their election to abandon the lien on the former and to enforce it on the latter. The only ground on which the plaintiff can justly complain of the bank's action is, that it was his right to have the funds applied on the former judgment. The real

question then is, Was the plaintiff discharged by the bank's neglect to apply the avails of the attached property on the indorsed-note execution, or by their failure to levy it upon them?

The creditor may, without prejudice to his rights against the surety, decline to accept additional security offered by the principal. *Bank* v. *Young*, 43 N. H. 457, 461. He is under no obligation to pursue any of the remedies which the law gives him against the principal, though the surety requests him to do so. *Davis* v. *Huggins*, 3 N. H. 231; *Mahurin* v. *Pearson*, 8 N. H. 539. He need not prove the debt against him in bankruptcy, exhibit the note to the deceased principal's executor, nor, if his estate is administered as insolvent, present it to the commissioner for allowance. *Sibley* v. *McAllaster*, 8 N. H. 389. In short, he is not required to take any active measures to obtain payment either directly from the principal, or out of property which he holds as security. *Bank* v. *Rogers*, 16 N. H. 9, 17, 18. As between creditor and surety, it is the surety's business to see that the principal pays. *Sibley* v. *McAllaster*, 8 N. H. 390. The creditor's chief purpose in requiring a surety is to avoid the necessity of resorting to legal remedies against the principal,—to escape the vexation and expense of litigation, and cast that burden upon another. The surety's contract is, that he will himself pay the note when it falls due, and not that he will pay it in case the payee or holder cannot by due diligence enforce payment by the principal. If he performs his contract, the creditor has neither cause nor opportunity to institute legal proceedings.

A surety paying the debt is entitled to be subrogated to the securities and remedies held by the creditor at the time of payment. If the creditor without the surety's consent surrenders a demand placed in his hands by the principal as security for the payment of the debt, the surety is discharged to the extent of its value. *Bank* v. *Colcord*, 15 N. H. 119; *Watriss* v. *Pierce*, 32 N. H. 560. It does not, however, follow that he is discharged by the creditor's abandonment of a lien which he has obtained on the principal's property by process of law. The lien acquired by attachment differs from ordinary securities, among other things, in that it cannot be preserved without active diligence and continuous expense. It is dissolved by a failure to enter the action, by its discontinuance after entry, by a judgment for the defendant, and expires by operation of law in thirty days after judgment for the plaintiff. G. L., c. 224, s. 86. In order to maintain and avail himself of the lien, the plaintiff must pursue the suit to judgment in his favor, and make a levy within thirty days thereafter. Both the prosecution of an action and the making of a levy are attended with trouble and expense. By a levy, if the property is in dispute, serious liabilities may be incurred. The creditor is under no obligation to subject himself to the expense or to the liability for the surety's benefit. The latter, by seasonable payment of the debt, may acquire the right to adopt and

prosecute the action, and make the levy for his own benefit at his own expense. He is not obliged to exercise the right. He may adopt the action, or not, as he sees fit. If he does not, the creditor has no claim upon him for the expense of the suit. If he does, he must take, with the benefit of the action, the burden of its cost. *Low* v. *C. & P. Railroad*, 45 N. H. 370, 378, 379. It would be unjust to permit him to avail himself of the security without paying what it cost the creditor to procure and preserve it. He must also indemnify the creditor against further costs. *Bank* v. *Rogers*, 16 N. H. 9, 17. It was (as for the purposes of the present question is assumed) the plaintiff's right, on payment of the debt for which he was liable within thirty days after the judgment was rendered, together with the accrued expense of the bank's action against Dearborn and indemnifying them against further expense, to levy their execution for his own benefit on the attached property. If he thus became entitled to and claimed the right, the bank was bound to permit him to make the levy. This was the full extent of the plaintiff's right and of the bank's obligation. That the plaintiff did not assert the right was not the fault of the bank. He stands no better than he would if, being present at the time of the application made by the bank, he had protested against it, and had done nothing more. His non-acquisition of the attachment lien was due to his own neglect, and not to any fault of the bank. What might have been his remedy if he had acquired and claimed the right to levy, and the bank by reason of a previous application of the funds on other judgments, or for any cause, had refused to permit him to make it, is a question not raised by the case.

A surety is not discharged by the creditor's discontinuance of an action brought by him against the principal, and the consequent dissolution of an attachment of the principal's property. *Bank* v. *Rogers*, 16 N. H. 9; *Baker* v. *Davis*, 22 N. H. 27, 37; *Barney* v. *Clark*, 46 N. H. 514. In the last named case the action was discontinued after the defendants were defaulted. If a reason might be suggested (though none has been, and none is perceived) for giving to the abandonment of an attachment after a default or after judgment a legal effect different from an earlier abandonment, there is no ground for claiming any greater effect for one made after judgment than for one made after a default. A defendant's liability, and a plaintiff's right to the application of the attached property in satisfaction of the debt, are as conclusively fixed by a default as by a judgment. It cannot be held that the plaintiff was discharged from liability by the bank's failure to levy the execution and the consequent dissolution of the attachment by lapse of time, without overruling *Barney* v. *Clark*.

A surety has no right, in law or in equity, to require the creditor to satisfy his demand out of the principal's property rather than his own. For the purpose of his remedy for a breach of the contract

the creditor is entitled to treat the surety as a principal. He may sue them jointly, or severally if the contract is several, attach the property of each, and levy his execution upon that of either, at his election. The position of the plaintiff cannot be sustained without depriving the creditor of this right. A creditor holds a note for $100 against A with B as surety, and a note for the same sum against A alone. He sues the former note, attaches and sells on the writ the property of each to the value of $100, and also sues the latter note and attaches the same property of A subject to the former attachment. He obtains judgment at the same time in both suits. Apparently both debts are fully secured. But the avails must be applied on one or the other of the judgments within thirty days, or the security is lost. If the avails of A's property are applied on the judgment against A and B, the latter is discharged because the debt is satisfied. If they are applied on the judgment against A alone, B is discharged, says the plaintiff, because thereby the attachment in the suit against A and B is released. It is not material at what time within the thirty days the creditor makes the application: its legal effect is the same whether made on the 29th, or at the last moment of the 30th day after the judgment. The surety's discharge is certain. He has no occasion to pay the debt and assert his right to levy the joint execution on A's property. It is better for him to stand aloof and do nothing. In effect, he is discharged by the attachment, or at all events by the attachment and judgment. If the creditor attaches the principal's property and pursues the action to judgment, the surety is inevitably discharged. If he attaches land, he must take his pay in land at its appraised value, instead of the lawful money which the surety as well as the principal agreed to pay. If such is anywhere the law, it is not the law here.

The lien acquired by attachment is merely the right to levy the execution on the particular property attached. *Kittredge* v. *Warren*, 14 N. H. 509, 526. It is a valuable right, but it is of no greater value than the right to levy on property not attached. The creditor has no better right and is under no greater obligation to the surety to levy on the attached property than on any other equally exposed to levy. The surety may be no more injured by his failure to levy in the one case than in the other. If he is not discharged by the creditor's refusal to levy at his request on a failing principal's unincumbered property which other creditors are about to seize, and which is pointed out to him by the surety (*Davis* v. *Huggins* and *Mahurin* v. *Pearson*, before cited), no good ground is perceived for holding that he is discharged by a neglect to levy on property attached. In each case alike the surety may pay the debt, and levy the execution for his own benefit.

The doctrine contended for by the plaintiff is not necessary for the surety's protection. So far as it might tend to deter the creditor from bringing suit against and attaching the property of

the principal, it would operate to his prejudice. He is chargeable with knowledge that the principal has not performed the contract, if such is the fact. The creditor is not bound to inform him that the debt is not paid. *Sibley* v. *McAllaster*, 8 N. H. 389, 390; *N. H. Savings Bank* v. *Downing*, 16 N. H. 188. The plaintiff might have had the full benefit of the attachment by performing his contract and paying the debt at any time while the lien subsisted. It is no sufficient answer for him to say that he did not know of the suit against Dearborn, or of the attachment. The bank were under no obligation to sue Dearborn, to attach his property, or upon doing so to notify the plaintiff of the fact. Service of the writ upon the plaintiff was notice that the debt had not been paid. He was put upon inquiry touching all the facts relating to his liability. Ordinary care would have informed him of the suit against Dearborn, and of the attachment. His loss is caused, not by any act of the bank, but (1) by his own breach of the contract in not paying the note when it fell due, and (2) by his subsequent negligence. The cited and conflicting decisions in other jurisdictions have not been overlooked.

*Demurrer sustained.*

SMITH, J., did not sit: the others concurred.