Coös,
Oct. 3, 1911.

### BERLIN NATIONAL BANK *v.* GUAY.

A surety on a promissory note is not released from his obligation by the payee's failure to exercise diligence in obtaining additional security from the principal debtor.

The holder of a promissory note is under no obligation to litigate the title to collateral security at his own expense, for the benefit of a surety; but if he enters upon such litigation for the protection of all parties interested and in good faith makes a reasonable compromise with adverse claimants, a surety who had full knowledge of the situation and refused to participate in the proceeding cannot avoid payment of the note on the ground that a larger sum should have been realized from the security as a result of the suit.

ASSUMPSIT, upon a promissory note for $2,000, dated March 13, 1908, payable to the plaintiff, and signed by the defendant as surety. Trial by the court. Transferred from the December term, 1909, of the superior court by *Chamberlin,* J.

The original consideration for the note was a loan by the plaintiff, July 14, 1906, of $5,000 to one Decker, the principal upon the note in suit. This loan was made upon a promissory note of that amount and date, signed by Decker as principal and by the defendant and one Brooks as sureties. March 14, 1907, Decker paid $1,000, and

a new note for $4,000 was signed by the same parties in the same way. March 13, 1908, the $4,000 note was replaced by two notes for $2,000 each, both signed by Decker as principal; one—the note in suit—was signed by the defendant as surety and the other by Brooks.

April 28, 1907, Decker sold the stock and business of the Cousens Hardware Company, of which he was owner, to one Burbank for $9,600, taking the latter's notes in payment. May 31, 1907, Decker obtained of the plaintiff a loan of $5,350 upon his note, with the Burbank notes as collateral. Burbank subsequently incorporated the business under the name of the Burbank Company, and deposited the stock certificates amounting to $12,000 (120 shares) with the plaintiff as additional security for the payment of the Burbank notes which were all indorsed by one Woodward. The Burbank notes were taken by the plaintiff as collateral security for (1) the payment of Decker's note for $5,350, (2) the payment of all liabilities of Decker to the plaintiff as indorser or otherwise, and (3) the payment of the two Decker notes for $2,000 each, one signed by the defendant and the other by Brooks as sureties. When the Burbank notes were taken by the plaintiff, an arrangement was made to have purchases of stock in trade insured, the policies to be payable to the plaintiff in case of loss, and the proceeds to be first applied in payment of the Burbank notes and then in discharge of the liabilities to which the Burbank notes were collateral.

The defendant and Brooks became uneasy because of the existing situation; and on September 4, 1907, Miles, the plaintiff's cashier, procured from Decker the following agreement and delivered it to Brooks and Guay: "Whereas C. Brooks and Joseph Guay, of Berlin, N. H., have indorsed my note for the sum of four thousand dollars ($4,000), dated July 13, 1907, payable to the order of the Berlin National Bank, of Berlin, N. H., and I have also given my note to said Berlin National Bank for the sum of fifty-three hundred and fifty dollars ($5,350), dated May 31, 1907, said last mentioned note being secured by 128 notes for different sums, amounting to nine thousand six hundred dollars ($9,600), signed by E. A. Burbank and indorsed by Jason Woodward and by me indorsed to said Berlin National Bank, said Burbank notes being secured by 120 shares of the stock of the Burbank Company as collateral. Now, therefore, I agree that after the payment to said bank of said last mentioned note—that is, the note of E. A. Burbank—and the discharge of all my liability as indorser or otherwise to said Berlin National Bank,

that the proceeds of said E. A. Burbank's note shall be applied as fast as they are paid to the payment of the note for four thousand dollars ($4,000) indorsed by said C. Brooks and Joseph Guay."

February 4, 1908, all the property of the Burbank Company was destroyed by fire. There was no insurance payable to the plaintiff, as arranged when the Burbank notes were taken as collateral; but immediately after the fire Miles, acting for the bank and to protect the interests of all parties arising out of the transactions hereinbefore stated, took an assignment to himself as trustee of policies amounting to $10,500. After the assignment of the policies suits were brought by creditors of the Burbank Company, in which the insurance companies were summoned as trustees. These suits were duly entered in court and Miles appeared as claimant of the funds trusteed. During the September term, 1909, at Colebrook, the suits came on for trial.

While the cases were pending and about to be tried, the defendant and Brooks, upon request, attended with their counsel a meeting had at the plaintiff's banking rooms in Berlin. It was proposed by some of the directors of the bank that Brooks and Guay join with the bank in the suits of the creditors of the Burbank Company, and that counsel engaged for the bank be authorized to act for all. The defendant and Brooks declined to enter into the agreement and disclaimed any interest in the litigation, claiming they were not liable upon the notes. Brooks and the defendant were not represented by counsel or otherwise at the hearings subsequently had at Colebrook. One of the cases was heard at Colebrook and resulted in a decree discharging the trustees. Upon the suggestion of the presiding justice, other suits were compromised. By agreement, decrees were entered under which the proceeds of insurance policies amounting to $9,569.96 were paid over to Miles. From this fund Miles paid the creditors in the various suits $2,706.66 (being a percentage of their claims), retained $250 as his fees and expenses, and applied $5,875.34 upon notes of Decker held by the plaintiff and $737.96 upon a note of Woodward. After the deposit of the Burbank notes as collateral, Decker increased his indebtedness to the bank to the amount of $360, giving one note for $300 and one for $60. These two notes were included in making up the $5,875.34 of Decker's indebtedness extinguished by the proceeds of the insurance.

By refusing to join in the litigation in the trustee suits, the defendant did not intend to waive any right to have the proceeds of the

Burbank notes applied according to Decker's agreement of September 4, 1907; and it was ruled as matter of law that he was not estopped to now insist upon such application. The court ruled that the sum of $737.96 applied on the Woodward note and the sum of $2,706.66 paid creditors should have been applied on the Decker notes for which Brooks and the defendant were sureties, and that the plaintiff could have judgment for the amount due on the note in suit, less $1,722.31, that being one half of the sum paid on the Woodward note and to creditors. To this ruling and the ruling upon the question of estoppel the plaintiff excepted.

The plaintiff requested a finding "that the compromise settlement made by Miles at Colebrook, as trustee, was a fair and reasonable settlement of a disputed claim." Upon this request the court found "that if Miles had a legal right to apply the money received by him as he did, the settlement was reasonable; but if he was legally obligated to apply the money in his hands in accordance with the Decker agreement, the settlement was not reasonable without disclosing the terms of that agreement and obtaining the consent of the defendant." Neither the justice presiding at the Colebrook term nor the plaintiff's counsel at that time were informed of Decker's agreement of September 4, 1907.

*Herbert I. Goss* and *Drew, Shurtleff & Morris* (*Messrs. Goss* and *Morris* orally), for the plaintiff.

*William H. Paine* and *Sullivan & Daley* (*Mr. Sullivan* orally), for the defendant.

PARSONS, C. J. The most favorable view for the defendant is that he was surety upon the note in suit for Decker, the first signer. While this debt from Decker and the defendant was owing the bank, the bank discounted for Decker a note for $5,350 and received as collateral security certain notes payable to Decker, called the Burbank notes, amounting to $9,600. These notes were taken by the plaintiff, not only as security for the $5,350 note, but also as security for any other indebtedness of Decker's to the bank, including that upon which the defendant was liable as surety. The consideration of the Burbank notes was the sale to the signer (E. A. Burbank) by Decker of the stock and business of the Cousens Hardware Company. When the plaintiff took the Burbank notes, an arrangement was made to have the stock purchased by Burbank

insured, payable to the plaintiff in case of loss, the funds, if any, realized therefrom to be applied by the bank to the payment of the Burbank notes and the payment of the indebtedness for which those notes were held as collateral. The note of $5,350 was dated May 31, 1907, and the agreement between the bank and Decker as to the disposition of the proceeds of the collateral appears not to have been reduced to writing. Subsequently, the cashier of the bank procured from Decker a written agreement which he delivered to the defendant, providing that after payment of the $5,350 note and the discharge of all his liability to the bank as indorser or otherwise, the proceeds of the Burbank notes should be applied to the payment of the debt for which the defendant was surety. This agreement accords with the terms under which the bank received the notes the May before, except that it contains no mention of insurance. Shortly after his purchase of the Cousens Hardware Company, Burbank organized the business into a corporation known as the Burbank Company and deposited the stock certificates with the plaintiff as additional security for the payment of his notes. The arrangement as to insurance was not effected. February 4, 1908, the property of the Burbank Company was destroyed by fire.

The defendant claims that the failure of the bank either to secure insurance itself or to cause the owner of the property to effect insurance payable to it discharged him from liability upon Decker's debt. It will not be necessary to consider the questions whether the bank as a general creditor of the Burbank Company (against which, so far as appears, it had no claim), or as pledgee of the stock of the Burbank Company, could have obtained insurance upon the property of that corporation; or whether, in case the Burbank Company had insured its property payable to the bank as its interest might appear, or had assigned its policies of insurance before loss to the bank, the legal title of the bank to the proceeds of the policies after the fire would have been so clear that none of the general creditors of the Burbank Company would have disputed it. The defendant's position is merely that the plaintiff by diligence might have secured additional security. Assuming that it could, the defendant is in no worse case than if the security were voluntarily offered and refused. Assume that Burbank or the Burbank Company before the fire offered the bank the insurance security which it is found was arranged for when the loan of $5,350 was made, and the plaintiff refused to accept it: the refusal would

not have discharged the surety, because a creditor is under no obligation to accept collateral security when offered by the principal debtor.

"The creditor may, without prejudice to his rights against the surety, decline to accept additional security offered by the principal. *Bank* v. *Young*, 43 N. H. 457, 461. He is under no obligation to pursue any of the remedies which the law gives him against the principal, though the surety requests him to do so. *Davis* v. *Huggins*, 3 N. H. 231; *Mahurin* v. *Pearson*, 8 N. H. 539. He need not prove the debt against him in bankruptcy, exhibit the note to the deceased principal's executor, nor, if his estate is administered as insolvent, present it to the commissioner for allowance. *Sibley* v. *McAllaster*, 8 N. H. 389. [*Stevens* v. *Hood*, 70 N. H. 177.] In short, he is not required to take any active measures to obtain payment either directly from the principal, or out of property which he holds as security. *Bank* v. *Rogers*, 16 N. H. 9, 17, 18. As between creditor and surety, it is the surety's business to see that the principal pays. *Sibley* v. *McAllaster*, 8 N. H. 389, 390. . . . The surety's contract is that he will himself pay the note when it falls due, and not that he will pay it in case the payee or holder cannot by due diligence enforce payment by the principal." *Carpenter*, J., in *Morrison* v. *Bank*, 65 N. H. 253, 280.

The remaining question is whether the action of the bank or its cashier, Miles, after the fire, has discharged the defendant. Immediately after the fire, Miles took from the Burbank Company to himself as trustee an assignment of insurance policies amounting to $10,500. In doing this he acted for the bank and to protect the interests of all parties arising out of the transactions between the bank and Decker. The terms of the assignment are not disclosed; but as the only claim the bank had to any payment from the Burbank Company was founded upon the notes and stock it held as collateral, it is assumed that the proceeds of the policies were intended to be applied in the same way to the extinguishment of the liability of Decker to the bank, in the order agreed upon when the collateral was left with the bank. The defendant therefore was entitled to have the money realized upon the policies applied to the extinguishment of the debt upon which he was liable, after the satisfaction of the liabilities of Decker upon which the proceeds of the notes were made first applicable. Whether Decker could incur further indebtedness after the collateral was left, which would take precedence of the debt upon which Brooks and Guay were liable,

would depend upon the terms upon which the collateral was deposited. The court interpreted the agreement as permitting such increase of Decker's indebtedness and approved the application of the proceeds of the policies to an indebtedness of $360 subsequently incurred, making the total of the Decker indebtedness entitled to precedence in the application of the proceeds of the Burbank notes, $5,875.34. To this ruling the defendant took no exception and no question is here raised thereby. Whatever the plaintiff realized out of the assignment of the policies in addition to this sum was applicable to the remaining indebtedness of Decker, which consisted of the $2,000 note in suit and one of like amount on which one Brooks was surety. There was therefore for application on the defendant's note one half of the sum realized over and above $5,875.34.

Immediately after the assignment to Miles, creditors of the Burbank Company brought suit against them, trusteeing the insurance companies. Miles appeared as claimant in these suits under the assignment to him. After the trial of one suit a compromise was made, by which it was agreed that the trusteeing creditors should receive either from the bank or out of the insurance fund a certain percentage of their claims. Thereupon decrees were made upon which insurance money amounting to $9,569.96, which had been collected by a receiver, was paid over to Miles. Miles paid the creditors' percentage ($2,706.66), retained $250 as his charges and expenses, and paid over to the bank or, as an officer of the bank, applied $5,875.34 to the indebtedness of Decker which had prior claim to the collateral and $737.96 to a note of Jason Woodward, thus disposing of the entire amount. The ground of the application of $737.96 upon the Jason Woodward note does not appear, and the plaintiff concedes that as the case stands this amount should be applied on the notes for which Brooks and the defendant were sureties, *i. e.*, one half that sum upon the note in suit. This would dispose of all that was realized upon the insurance policies; for it is clear that to free the funds from the claims of the attaching creditors the plaintiff paid either directly or indirectly $2,706.66, so that the sum actually realized for application upon the Burbank and Decker indebtedness was that sum plus expenses ($250) less than the total amount of the insurance fund.

The controversy relates solely to the compromise payment to the attaching creditors. The question is whether the plaintiff is to be charged with that sum as wrongfully paid out of the insurance

fund, or refused credit for it as a reasonable expense of realizing upon the assignment of the policies. Counsel do not differ as to the law. It is conceded in argument that if under all the circumstances the compromise was reasonable, the defendant cannot complain. The controversy relates to the interpretation of the finding upon this point. The court found "that if Miles had a legal right to apply the money received by him as he did, the settlement was reasonable; but if he was legally obligated to apply the money in his hands in accordance with the Decker agreement, the settlement was not reasonable without disclosing the terms of that agreement and obtaining the consent of the defendant." This appears to mean that the settlement was reasonable in fact, unless as matter of law the plaintiff could not legally settle the controversy nor withdraw from the litigation with the trusteeing creditors without the consent of the defendant. The answer to the proposition is found in the quotation previously made from *Morrison* v. *Bank*, 65 N. H. 253. The plaintiff was under no obligation to litigate its title to the collateral for the benefit of the defendant, nor, if it did so, was it obliged to do so at its own expense. Miles or the bank were obliged to apply the proceeds of the collateral secured by Miles' vigilance after the fire in accordance with the terms under which they held the Burbank notes and stock, of which the agreement signed by Decker and given Brooks and Guay was evidence; but they were not obliged to apply anything which they did not succeed in collecting. The assignment was collateral security. Anything paid to the bank under it they were legally bound to apply in accordance with Decker's directions, but they were not bound to bring suit on it. After the attachment of the funds, the assignment was worthless unless the bank took active measures to enforce it, appeared as claimant, and gave bond for costs. Having entered upon the litigation, so long as they acted in good faith they were at liberty to withdraw therefrom whenever they desired to do so; and the defendant could not complain, for it was the defendant's duty to pay the debt and conduct the litigation. He had full and seasonable information of the situation, but he refused to assume the debt for which the security was held, or even to join in the attempt to realize thereon.

The case of *Morrison* v. *Bank*, 65 N. H. 253, before referred to, involved very similar questions and was decided after great consideration. There the bank, having a note upon which the plaintiff Morrison was surety, sued the principal and attached property more than sufficient to satisfy the notes in that suit, and also sued the

surety.    After judgment against both, the bank applied the attached property upon claims against the principal, in suits in which the attachment was made subject to the one in which the note upon which Morrison was liable was sued, and collected the judgment against Morrison, who, upon learning the facts as to the order of the attachments, brought a bill in equity to recover the money paid on the judgment against him.    It was held that the creditor, being under no obligation to bring the suit against the principal, could stay the proceeding at his pleasure; and that the surety was not discharged by the neglect to levy upon the attached property, or by the application of it upon judgments in subsequent attachment suits. In that case the surety Morrison had only constructive knowledge of the security obtained by the creditor by attachment.    Here the defendant surety was fully informed of the situation.    He knew that to realize upon the security claimed to have been obtained involved litigation.    He was invited to join therein and refused. . He could not expect to control or to be consulted as to the conduct of litigation in which he refused to participate and in which he claimed he had no interest.

As the plaintiff was not legally bound to notify the defendant before making an adjustment of the litigation, the finding of the court means that the settlement was reasonable.    In other words, in the conduct of the litigation in good faith the plaintiff recovered on the assigned insurance all that it reasonably could.    This being so, the defendant cannot complain that more was not recovered. The plaintiff's exception to the ruling of the court applying one half the sum paid creditors upon the note sued and to the amount of the judgment ordered is sustained.    The plaintiff is entitled to judgment for the amount due on the note, less one half the amount applied on the Jason Woodward note.

*Case discharged.*

All concurred.